UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JALEN HOWARD,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:24-cv-00217-TWP-TAB |

**ORDER DENYING 28 U.S.C. § 2255 MOTION**

This matter is before the Court on Petitioner Jalen Howard's ("Howard") Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Dkt. 1). In September 2021, a jury found Howard guilty of possessing a firearm as a convicted felon. He has served his prison sentence and is now completing his term of supervised release. He asks the Court to vacate his conviction and sentence on grounds that he was deprived of his Sixth Amendment right to effective assistance of counsel. For the reasons explained below, the motion is **denied**.

## I. THE § 2255 MOTION

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which

results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. FACTS

### A. Arrest and Charge

The Government sought a warrant to arrest Howard on July 18, 2019. (Crim. Dkt. [1] 2). According to the warrant affidavit, Indianapolis Metropolitan Police Department ("IMPD") officers appeared at the intersection of Tacoma Avenue and 16th Street four times on June 29, 2019. *Id.* at 3. Each time, they responded to reports of gunfire. *Id.*

The fourth call came between 11:30 P.M. and midnight and described two white men, at least one armed, in front of an abandoned house. *Id.* When officers arrived on the scene, they encountered the 911 caller, who pointed them toward a group of six men on the corner. *Id.* at 4. Officers ordered the men to place their hands in the air, then to lie prone. *Id.* When the men complied, officers saw that at least two men had handguns in their waistbands or pockets. *Id.* Officers conducted pat-downs of the six men and found a Glock Model 23 handgun in Howard's waistband. *Id.*

On August 6, 2019, a federal grand jury charged Howard with one count of possessing a firearm as a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Crim. Dkt. 5).

### B. Trial

Attorney Harold Samuel Ansell appeared for Howard in September 2019 and represented him through trial. (Crim. Dkt. 25). Attorney Ansell filed no pretrial evidentiary motions. A jury found Howard guilty on May 5, 2026, at the conclusion of a two-day trial. *Id.* at 117.

[1] *United States v. Howard*, No. 1:19-cr-00255-TWP-MJD.

The only issue contested at the trial was whether Howard actually possessed the Glock 23 attributed to him in the indictment. However, the only issue contested in this § 2255 proceeding is whether Attorney Ansell should have moved to suppress the Glock 23 and other evidence of the search and seizure under the Fourth Amendment. Accordingly, the Court reviews the trial evidence with a focus on the legality of the search and seizure.

**1. Government's Evidence**

The Government's theory of the case aligned with the arrest warrant affidavit. IMPD officers approached the intersection of 16th and Tacoma late on June 29, 2019 after receiving multiple reports of gunfire. The latest 911 caller directed them to a crowd of six men. Officers ordered them to the ground and observed that at least two were armed. They patted down each man, including Howard, and found the Glock 23 in his waistband. The Government supported this theory with testimony from three witnesses.

**a. Cory Lindley**

IMPD Patrol Officer Cory Lindley testified to the following facts. (Crim. Dkt. 127 at 57:11–108:15). Officer Lindley approached the intersection of 16th and Tacoma at approximately 11:45 P.M. on June 29, with three other officers, in response to a 911 call reporting gunfire. Officer Lindley had responded to another call in the same area around 10:00 P.M. regarding a car that had been shot. When officers responded to the 11:45 call, they parked their patrol cars and approached the area on foot. They encountered the 911 caller, who told them she saw a large group of men armed men at the corner of 16th and Tacoma.

The officers saw six men standing in front of an abandoned house. Due to the reports of gunfire, the four officers approached with their guns pointed at the six men.

The officers ordered the six men to raise their hands and walk into the street. One man began to reach into his waistband. After an additional command, the six men walked into the street one-by-one as ordered. Once in the street, the officers directed each man, individually, to walk to a spot away from the others and lie face down with his arms spread out.

The officers patted down the six men and found guns on four of them, including the Glock 23 in Howard's waistband.

**b. Michael Kasper**

IMPD Patrol Officer Michael Kasper next testified to the following facts. *Id.* at 110:9–130:23. Officer Kasper was one of the four officers who approached 16th and Tacoma around 11:45 P.M. on June 29. He saw six men in front of the abandoned house. He pointed his gun at them as Officer Lindley ordered them into the street.

Officer Kasper knew that, because the officers were outnumbered, they would order the men to lie down in the street one by one. As a safety measure, he looked and confirmed that there were no weapons on the ground that one of the men could access once lying down. He also did not see or hear any of the men drop a weapon or pass anything between one another.

Once the men were in the street, they followed orders to lie prone, about two arm-lengths away from one another. Pat-downs yielded four guns from four different men.

**c. Emma Brown**

U.S. Bureau of Alcohol, Tobacco, and Firearms Special Agent Emma Brown testified during the Government's case in chief and in rebuttal. (Crim. Dkt. 127 at 131:18–147:7); (Crim. Dkt. 154 at 178:17–185:2). She testified that ATF records show that the Glock 23 allegedly taken from Howard was originally purchased by Christopher Casey ("Casey"), another member of the six-person group confronted by officers on June 29, 2019. She also testified regarding recorded

telephone calls Howard made from jail. Those calls are not transcribed in the trial transcript, and they are not presently in the record for either the § 2255 action or the criminal case. (*See* Crim. Dkts. 163, 169) (trial exhibits released for pickup and disposed).

**2. Defense Evidence**

Howard built his defense around the theory that he never possessed a gun on June 29, 2019 and that officers falsely attributed one to him after taking it from someone else. Howard presented the following evidence.

**a. Christopher Casey**

The defense first called Christopher Casey, a longtime friend of Howard and one of the men confronted by IMPD officers on June 29, 2019. He offered the following testimony. (Crim. Dkt. 18:4–58:16).

Earlier in the day on June 29, Casey and Tyler Gigure ("Gigure")were driving in the area near 16th and Tacoma and were shot at by an unidentified man. They reported the incident to police and spoke with an officer in person. Later that, Howard joined Casey and Gigure. They dropped Gigure off at a house near 16th and Tacoma and heard gunfire from a nearby house. They again called police to report the incident and heard more gunfire after doing so.

Casey was among the men officers confronted late on June 29. He was at that time carrying two guns, including the Glock 23.

**b. Joseph Rufus Rice**

The defense next called Joseph Rufus Rice ("Rice"), another longtime friend of Howard who was present on June 29, 2019. He offered the following testimony. (Dkt. 154 at 61:13–102:23).

Rice lived near 16th and Tacoma and was outside "all day" and "all night." *Id.* at 62:19–20. He spent time with both Casey and Howard that day. According to Rice, Casey was armed with two guns, including the Glock 23. Rice testified that he could clearly see that Howard was not carrying a gun, including when police arrived and he lay on the ground. Rice also testified that he witnessed Tyler Gigure firing a gun in the area of 16th and Tacoma on June 29.

**c. Brandon Alexander**

The defense next called Brandon Alexander, who was among the group officers confronted late on June 29. He offered the following testimony. Crim. Dkt. 154 at 104:3–132:15.

Alexander went to 16th and Tacoma with a handgun after one of the other men told him by phone about one of the shootings that happened in the afternoon. He was present when a car got shot at and remained present through the police confrontation around 11:45 P.M.

Alexander spoke with police multiple times when they patrolled the area of 16th and Tacoma. He reported gun shots after the car shooting but reported every time thereafter that there had been no additional gunshots. Rather, he told officers that people had been setting off fireworks.

When officers confronted the group, they found a gun on Alexander.

**d. Tyler Gigure**

The defense next called Tyler Gigure, another longtime friend of Howard who lived near 16th and Tacoma and was present on June 29. He provided the following testimony. Crim. Dkt. 154 at 134:3–173:20.

Gigure was with Casey on June 29 when a man opened fire on their car. Gigure recognized the shooter as a resident of the area.

When they spoke to police afterward, Gigure specifically asked if they could defend themselves if they were shot at again. He clarified that he was a felon.

Gigure called about 16 people to come to his house with guns, including rifles, in case there were additional shootings. Gigure asked Howard, who he believed was unarmed, to stay inside with Gigure's children while Gigure and others stood watch outside.

Like Alexander, Gigure spoke with police multiple times on June 29. During the evening, he reported that he had not heard additional gunshots but had heard fireworks.

When police arrived around 11:45, Gigure was concerned that there would be additional violence. He was unsure whether he could safely stay in his own home. He was concerned that the other shooters might "kick in our door and basically start shooting again, so we was trying to figure out what I was going to do." *Id.* at 143:11–19.

Gigure was armed when police arrived. When they ordered the men to put their hands up, Gigure reached for his gun and considered throwing it and running away. He instead chose to comply with orders. When he placed his hands in the air, his gun was visible.

#### e. Shirlena Northern

The final defense witness was Shirlena Northern, an investigator for the Indiana Federal Community Defenders. Northern testified briefly about the clothes Gigure had on when he was booked into the Marion County Jail following his arrest on June 29. (Crim. Dkt. 154 at 175:16–177:21).

## III. ANALYSIS

Howard asks the Court to vacate his conviction and sentence on grounds that he was deprived of his Sixth Amendment right to effective assistance of counsel. A § 2255 movant claiming ineffective assistance bears the burden of showing (1) that counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency

prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *Resnick v. United States*, 7 F.4th 611, 619 (7th Cir. 2021).

Howard specifically argues that Attorney Ansell performed deficiently and prejudiced him by failing to move to suppress the Glock 23 and all other evidence obtained on June 29. He argues that the officers' confrontation and pat-down violated his Fourth Amendment protection against unreasonable searches and seizures.

"When a petitioner alleges that counsel was ineffective for failing to move to suppress evidence," he must "'prove the motion was meritorious.'" *Long v. United States*, 847 F.3d at 920 (quoting *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005)). Because the facts would have demonstrated that Howard's gun was the fruit of a lawful search and seizure, his ineffective assistance argument fails.

**A. Significance of a Suppression Motion**

At surface level, a motion to suppress evidence obtained during the pat-down of Howard appears counterintuitive. After all, his theory at trial was that no gun was recovered during the pat-down and that officers falsely attributed another man's gun to him.

However, the parties offer no reason, and the Court is aware of none, why Howard could not have moved to suppress testimony regarding the pat-down and evidence allegedly recovered from Howard's person. In other words, Howard could have argued that, even if the Government's theory of the case was true, any evidence offered in support of that theory was subject to the Fourth Amendment exclusionary rule. Had Howard prevailed, the Government would have had no evidence to offer in its case in chief, and he could not have been convicted. Therefore, the Court proceeds to consider the viability of a suppression motion even though the factual basis for a suppression motion would have conflicted with the defense Howard put on at trial.

**B. Stop and Frisk**

The Fourth Amendment makes clear that "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures, shall not be violated." The parties agree that the Court's analysis of Howard's pat-down begins with *Terry v. Ohio*, 392 U.S. 1 (1968).

"[T]here can be no question" that IMPD officers "'seized' petitioner and subjected him to a 'search'" when they ordered him to the ground and "patted down the outer surfaces of his clothing." *Id.* at 19. The Court must determine whether the search and seizure were reasonable, considering "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19–20.

"Police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed." *United States v. Carlisle*, 614 F.3d 750, 754 (7th Cir. 2010). "When responding to an emergency report, officers may use the report, itself, to justify a *Terry* stop, provided that the report describes an ongoing emergency, as opposed to general criminality." *United States v. Williams*, 731 F.3d 678, 684 (7th Cir. 2013). A *Terry* stop requires that an officer reasonably suspect "that the subject is 'armed and dangerous' as opposed to being generally suspicious." *Id.* at 686.

The Seventh Circuit has "repeatedly emphasized . . . that the inherent danger of gun violence sets shootings apart from other criminal activity." *United States v. Rickmon*, 952 F.3d 876, 883 (7th Cir. 2020). Therefore, a *Terry* stop is more likely to be constitutional when the officer is "responding to an emergency report of shots fired, not one of general criminality." *Id.*

After the *Terry* stop begins, the officer carries "a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to

believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." 392 U.S. at 27. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*

### C. Lawfulness of Howard's Stop and Frisk

The evidence presented at trial—by Government and defense witnesses alike—demonstrates that the officers had constitutional authority to stop and frisk Howard on June 29, 2019. For this reason, a suppression motion would have failed, and Attorney Ansell cannot be deemed to have performed deficiently for declining to raise a suppression motion.

Officer Lindley testified that officers reported to 16th and Tacoma in response to a 911 call reporting gunfire. He responded less than two hours earlier to another shooting in the same area. The officers encountered the 911 caller, who pointed them toward the group of six men and said they had been shooting guns.

These facts gave the officers reasonable grounds to suspect that a crime was committed or was about to be committed. *Carlisle*, 614 F.3d at 754. And, not just any crime. The 911 caller's information, together with the officers' knowledge of earlier gunfire incidents in the area that day, gave them reason to suspect that inherently dangerous gun violence was afoot. *Rickmon*, 952 F.3d at 883.

The defense witnesses only bolstered this conclusion. Gigure testified that as many as 16 men had been called to the area with guns, including rifles, in response to shootings earlier in the day. When Gigure spoke with police earlier in the day, he disclosed that he was a felon *and* asked if he could return fire if shot at again. Rice testified that he witnessed Gigure firing a gun in the

area that day. Additionally, when police arrived, Gigure was considering spending the night somewhere else because he believed violence may continue. Evidence adduced by both sides leads to the conclusion that the officers who responded to the 911 call were justified in treating the situation as a dangerous emergency.

Once officers confronted the men, they became justified in conducting pat-downs. Officer Lindley attested that he saw guns on two men after he ordered them to place their hands in the air. Gigure admits not only that his gun was visible *but that he reached for it*. The officers were outnumbered six to four. A reasonably prudent officer would have questioned his safety, ensured that the men were not armed, and taken their guns before taking any other investigatory steps. *Terry*, 392 U.S. at 27.

Howard identifies a number of facts as weighing against finding reasonable suspicion: Howard himself did not fit the description given by the 911 caller; none of the men was engaged in overtly criminal conduct when officers approached; they took no steps to verify the 911 caller's reliability; the men were not actively shooting their guns when the officers approached. These facts do not overcome the others.

Four officers responded to a "shots fired" call after responding to several more in the same area that day. An eyewitness directed them to a group of six men and alleged that they had been firing guns moments before. Howard offers no authority, and the Court is aware of none, that required the officers to stand back and wait for a shootout to begin, or for one of the six men to draw a gun, to confront the men. The officers responding to shot fired situation clearly had cause to approach the men; once they did, they saw guns and had cause to frisk them all. Any motion to suppress the evidence obtained in those searches would have failed.

## IV. CONCLUSION

For the above reasons, Howard's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, Dkt. [1] is **DENIED**. This case is **dismissed with prejudice**. The **clerk is directed** to enter **final judgment**, docket a copy of this order in the criminal case (No. 1:19-cr-00255-TWP-MJD-1), and **terminate** the pending § 2255 motion (Dkt. 170) in that case.

## V. CERTIFICATE OF APPEALABILITY

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition; rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Howard has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date: November 23, 2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Scott Goehring
Katten Muchin Rosenman
scott.goehring@katten.com

William Lance McCoskey
DOJ-USAO
william.mccoskey@usdoj.gov

Jordan Oliver
Barnes & Thornburg LLP
joliver@btlaw.com

Yelena Shagall
Katten Muchin Rosenman LLP
yelena.shagall@katten.com